Filed 8/1/16  P. v. Villalobos CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B255090 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA331941) |
| v. | |
| JORGE ERNESTO VILLALOBOS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Suzette Clover, Judge.  Affirmed.

Jonathan P. Milberg for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr. and Connie H. Kan, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Jorge Ernesto Villalobos was convicted by a jury of first degree murder with a deadly weapon enhancement. He contends the judgment must be reversed because the evidence was insufficient to support the verdict, and the trial court made several evidentiary errors. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts*

a. *Christina Ingram's relationships with appellant and the victim*

Christina Ingram worked at the Burbank Elks Lodge as a part time bartender. Ingram began dating Villalobos, who lived with his parents in San Gabriel, in the spring of 2006. Their relationship was marked by frequent verbal arguments and Ingram felt he was too controlling. In approximately 2007, Ingram told Villalobos she wanted to "move on." They remained broken up for three to four months. During that period, Villalobos telephoned Ingram "continuously," asking her to give their relationship another chance. Eventually Ingram "gave in" and they began to date "on and off" in the fall of 2007. However, Ingram did not have feelings for Villalobos and "knew it wasn't going to last." In approximately late November 2007, she told Villalobos that she was going to date other people. Villalobos became "very angry and just very loud." He said that "nobody else was going to have" her, or words to that effect, "quite often." When Ingram and Villalobos argued, he would yell at her. Despite her desire to break up with Villalobos, to calm him down and de-escalate arguments she would sometimes engage in sexual activity with him. Ingram was afraid of Villalobos because she knew he possessed guns, knives, and a crossbow.

The victim, Glen Giles, was an Elks Lodge member. He lived on Joaquin Drive in Burbank, approximately 10 minutes' drive from the lodge. He was extensively remodeling his home. Due in part to the ongoing construction, the interior of the residence was sometimes unsecured and accessible. Ingram and Giles met at the Elks Lodge and began to date in late January 2008. Ingram did not tell Giles about Villalobos.

2

In late January 2008, Giles and Ingram met for a second date at the Robin Hood restaurant. After dinner, they shared a dessert and then walked to the parking lot where they hugged. After Giles left, Ingram saw Villalobos standing by her car. Ingram asked what he was doing there. He replied, " 'I can't believe you're doing this.' " He stated that friends had told him she was having dinner with Giles, and he "had to see it for himself." He made insulting remarks about Giles, asked what Ingram saw in him, and used profanity. He again asked that Ingram give their relationship another chance. When she declined, he started yelling. He stated that he "didn't want to be made a fool of and no one is going to mess with him" and he would " 'fuck up any motherfucker that plays with me.' " To avoid a scene in the parking lot, Ingram suggested they continue talking at her residence, where she and Villalobos had sexual relations.

At some point in February, Villalobos sent roses for Ingram to the Elks Lodge. While on duty that night she learned Villalobos was in the parking lot. Giles was also at the lodge at the time. On the lodge's video monitors, she saw Villalobos look at Giles as Giles left for the evening. When Ingram spoke to Villalobos, he made the observation that Giles was a lodge member.

A week before the murder, Villalobos and Ingram had another argument. He said he knew she was still seeing Giles because he had seen her with him. When Ingram reiterated that she did not want to date Villalobos any longer, he became angry, yelled, and asked for another chance. She again had sex with him to keep him quiet and because he refused to leave.

b. *Events of February 25 and 26, 2008*

On February 25, 2008, Giles had coffee with Ingram at a Starbucks located in a Vons store.

That evening, Giles attended a potluck bridal shower for the Elks Lodge chef, Jimmy Ewart, and Ewart's fiancée. Giles told Ingram, in a 9:00 p.m. telephone call, that he was going to play some basketball and have a drink with friends. She spoke to him again around 10:00 p.m. Giles left the lodge at or shortly before 10:00 p.m.

Ingram also communicated with Villalobos via texts and calls that evening. Villalobos asked Ingram to call to wake him up the next morning because he had an early training class at his work, Brinks Incorporated. Ingram called Villalobos as requested at 4:00 a.m. on February 26, 2008. She testified both that he seemed awake at the time and also "out of it a little bit." She then texted Villalobos at 7:00 a.m. stating, " 'Thank you for loving me' " and at 7:24 a.m. regarding a song she liked. Villalobos called her at approximately 8:30 a.m. to tell her his training had been cancelled and that he was getting his car washed and running errands.

c. *The discovery of Giles's body*

At approximately 10:00 a.m. on February 26, 2008, retired Burbank Police Lieutenant Duane Dow, who lived across the street from Giles, opened his front door to go for a walk with his wife. He discovered Giles's nude body slumped in a kneeling position against the wall on his front doorstep. Giles was "covered from head to toe with blood." There was blood on Dow's doorbell and a pool of blood underneath Giles's body. Dow called the police.

d. *The investigation*

(i) *Autopsy*

An autopsy showed Giles died of multiple stab wounds. He had been stabbed 32 times and suffered wounds to his back, chest, face, and abdominal area. Nine of the wounds were potentially fatal, and bled significantly. They ranged from a depth of three to six inches. Eight stab wounds were concentrated in Giles's left shoulder area. Two of the wounds appeared to have been inflicted close in time, when Giles was not moving. The location and placement of other wounds suggested Giles began to move during the attack. One of the blows severed a rib. Impressions on the body indicated the attacker used a serrated knife. Giles also sustained significant defensive wounds to his fingers, arms and hands. Based on the contents of Giles's stomach, the deputy medical examiner, Dr. Yulai Wang, opined that Giles died within two to four hours of his last meal.

4

(ii) *The crime scene*

A trail of blood led from Giles's house to Dow's front porch. "Copious" amounts of blood were found in Giles's home. It appeared to the investigating officer, Detective Mitchell Ross, that Giles had been attacked as he lay sleeping on a mattress on the floor in his bedroom. There was no sign of forced entry by the perpetrator.

Giles's bedroom was "covered in blood." The mattress was blood-soaked. There was blood on the bedroom walls; on a dresser; on the bedroom light switch; on the floor; on a pillow and blanket; and on the ceiling. The drywall on one wall had been gouged three times; there was blood inside the gouges. The concrete floor bore a similar gouge that appeared to have been made by a sharp object. The dresser bore six gouge marks. Bloody newspaper advertisements were strewn about the floor. Giles's wallet, which contained $110, was on his dresser. A cellular telephone charger was plugged into the wall, but Giles's cellular telephone was missing and was never found. Giles's severed fingertips were found in the bedroom closet. The blood in the bedroom appeared to be dry. Blood was also found in the great room, the dining room, and the hall. There was no sign the house had been ransacked.

There were two sets of bloody footprints in the house. The larger set of bare footprints belonged to Giles. He exited through a set of double doors on the north side of the house and continued across the street to Dow's house, pausing or collapsing several times on the way. The perpetrator's smaller footprints exited through a sliding glass door on the north side of the house. The perpetrator's footprints were "fabric prints," indicating the perpetrator wore socks. A bloody handprint was found on the sliding door through which the perpetrator appeared to have exited. Streaks in the handprint suggested the attacker wore gloves.

A large pool of blood was located on the home's north side, at the back concrete patio, near a faucet. The faucet or a hose had been turned on, soaking the area with an inch of water mixed with blood. Bloody newspapers were strewn along a walkway on the north side of the house.

Giles's home abutted a hillside and a one-foot high retaining wall separated the back of the house from the hillside. On the hillside, an officer found a bloody newspaper advertisement that appeared similar to those found in the bedroom, a wad of bloodstained money, and a Vons grocery receipt for the coffee that Giles and Ingram had shared the previous day. Disturbances in the dirt on the hill just behind the house appeared to be footprints. A concrete drainage channel ran the length of the hillside. It would have been relatively easy for someone to park at the nearby Brace Canyon Park, walk up Brace Canyon Road, go up the concrete drainage channel, and traverse an area covered with foliage down to Giles's backyard.

(iii) *Footprint evidence*

The bloody footprints at the scene appeared to have been made by Giles, whereas the murderer made the bloody sock prints. Villalobos's footprint had the same V-shaped heel formation, narrow arch, and toe spacing as did the sock prints; his footprints also appeared to be the same size as the sock prints. A forensic footwear expert compared the bloody sock prints with Villalobos's footprints and found that they corresponded. He opined that Villalobos, among only a "very small number" of people, could have made the sock prints.

(iv) *Dog scent evidence*

Using a device known as a "Scent Transfer Unit," dog handler Edward Hamm transferred the scent from the bloody handprint to a gauze pad. Hamm's bloodhound, Rosie, followed the scent down the hillside, across Brace Canyon Road, through a park, and across Crest Ridge Drive. She went in circles before heading back along Crest Ridge to Brace Canyon, to Joaquin Drive, and upto Giles's front door. Hamm interpreted her behavior as indicating the murderer's car had been parked on Crest Ridge. The murderer had followed a circular path from the car to Giles's front door, and then back down the hill. Rosie ignored the bloody money and receipt that the officers found on the hillside and which contained Giles's blood.

6

The next day, Hamm's bloodhound Bojangles was taken to the Brinks facility where Villalobos worked. From a nearby street, Bojangles followed the scent on the scent pad approximately 100-150 feet through a gate into a Brinks lot, where armored trucks were parked. Bojangles's behavior suggested a scent matching that on the scent pad was present, but he did not alert to any particular truck, door, or locker, or to any persons in the area. Hamm and Bojangles then went to San Gabriel and parked around the corner from the Villalobos residence. Bojangles followed the scent from the scent pad to Villalobos's front door.

(v) *Villalobos's arrest*

After a warrant was obtained, officers Stephen Turner and Edmundo Zepeda, assisted by several undercover police units, stopped Villalobos as he was driving away from his residence in his Mustang at approximately 4:30 a.m. on February 27, 2008. Turner searched Villalobos and placed him in the marked police car. At the direction of a superior officer, Turner entered the driver's side of the Mustang and drove it to a police staging area located a block or two away. Turner saw Villalobos's cellular telephone in plain view in the center console cup holder and gave it to another officer for examination. Turner did not search the Mustang. Neither Turner nor anyone else searched or reentered the Mustang at the staging area, or entered the Mustang's passenger side, and Turner did not enter any other portion of the Mustang.[1] Officers stayed with the Mustang, ensuring it remained secure, while other officers executed the warrant at Villalobos's residence. The car was then towed to the police garage where it was secured.

---

[1] On February 26, 2008, at approximately noon, Turner had questioned Giles's neighbors and assisted in canvassing the Joaquin Drive neighborhood; however, he was not at the crime scene. From 4:48 p.m. until 5:45 p.m., he assisted the dog handler search the hillside behind Giles's house. He assisted searching the hill again from 6:35 p.m. until 10:00 p.m. He never went inside Giles's home and did not see any blood in the backyard. He did not pass the area with the hose and bloody water. He never went across the street to Dow's home. He did not change his clothing or shoes before moving the Mustang to the staging area.

7

When arrested, Villalobos had a purplish discoloration on his elbow, marks on his right hand and index finger, and a discoloration on his back.

(vi) *Search of Villalobos's car*

A forensics team processed Villalobos's car at the police garage on February 28, 2008, at approximately 11:00 a.m. A criminalist observed several stains in the Mustang that tested presumptively positive for the presence of blood. He found such stains on the driver's side interior door panel, near the lock; on the driver's seat and seat back; and on the front passenger seat and seat back. Some were red stains, while others were dark stains that did not immediately appear to be blood. The center console also tested positive for the presence of blood and had white areas that appeared to have been buffed. The criminalist selected three of the stained areas for DNA testing. DNA testing revealed that the blood found on the passenger seat back and driver's seat back was Giles's.[2] The sample taken from the driver's side door panel contained very little material, and was inconclusive.

(vii) *Search of Villalobos's home*

A detective discovered three knives in Villalobos's bedroom closet. Two of the knives, a "Ka-Bar" and a "SOG" knife, were in their boxes. A third knife, also a Ka-Bar, was in a plastic sheath in a duffle bag in the closet. Also inside the closet were four handguns, four magazines, two bolt-action rifles, and two 12-gauge shotguns. A pair of jeans in Villalobos's size was in the clothes dryer.

(viii) *Cell phone evidence*

Between February 14 and February 24, 17 calls were made from Villalobos's cellular telephone to Giles's cellular telephone. The calls were made using a blocking feature that prevented Giles from identifying who was calling. The brief duration of the calls indicated the caller hung up without leaving a message or was routed to voicemail.

---

[2]    The chance of the DNA belonging to someone other than Giles was one in 270 quadrillion.

On the night of February 25, 2008, a blocked call was made from Villalobos's cell phone to Giles's phone at 10:34 p.m. That call was picked up by a cell site located at 10771 Sherman Way in Sun Valley, indicating Villalobos was within three miles of that location at the time. At the time Villalobos made the 10:34 p.m. call, Giles's phone was within the area covered by the cell site closest to his house.

At 12:45 a.m. on February 26, 2008, there was a "data transaction" on Giles's phone, which could have been "user generated or non-user-generated." Giles's cell phone was, at that time, moving southwest. A text was either received or sent by Giles's phone at 1:17 a.m.

(ix) *Expert testimony regarding the knives*

Ernest Emerson, a manufacturer and designer of specialty combat knives, testified regarding the quality and characteristics of the three knives found in Villalobos's closet. "Ka-Bar" is a generic name for a specialty fighting and utility knife used by the United States Marine Corps since World War II. The SOG knife is also a military knife used by the United States Navy Seals. In Emerson's opinion, the Ka-Bar knife found out of its box, in the duffle bag, had been used. It had two small, flattened portions on the edge indicating it struck something harder than the steel of the blade, such as cement or a rock. The damage was very difficult for a non-expert to see. There were also marks or scratches on the blade, laterally and across on both sides, that could have been caused by cleaning the knife. In Emerson's opinion, the SOG knife and the Ka-Bar knife found in its box were in pristine condition and had not been used.

The Ka-Bar knife that had been used had several features making it an effective offensive weapon. A backstop or rear guard assisted a user to easily pull the knife out after it had been inserted into something. The ergonomic grip was made of a grooved rubber that provided traction and was impervious to liquids. A hilt or guard protected the hand from sliding onto the knife during use. These features of the knife would help prevent injuries to the hand. In Emerson's opinion, the used Ka-Bar knife model provided the greatest degree of protection for someone using the knife, as opposed to the other two knives. The knife was effective as a combat weapon due to its thickness; its

9

7-inch blade, which was designed to penetrate vital organs no matter where the opponent was struck; and the presence of grooves along the blade, which allowed blood to flow out of a wound, hastening death. Unlike a hunting knife, the Ka-Bar was designed so that the force of a thrust was concentrated at the point. The used Ka-Bar knife, like the other two, had a serrated edge. Ka-Bar knives were readily available at sporting goods, military surplus, and other stores.

Debra Kowal, a toolmark expert, reviewed photographs of the knives and the autopsy report during her technical review of the conclusions of another toolmark analyst, Steven Dowell. Based on a comparison of the measurements of the knife and the width and depth of the wounds, Kowal opined that none of the three knives found in Villalobos's closet could be excluded as the murder weapon, the same conclusion Dowell had reached. Some of the abrasions on Giles's body were made by a serrated blade. Villalobos's three knives "certainly could have" inflicted Giles's injuries, but none could definitively be identified as the murder weapon.[3]

The used Ka-Bar knife and its sheath were tested for DNA. The DNA mixture on the sheath included at least four people. It was not certain that Giles's DNA was present on the sheath; there were DNA types consistent with his DNA, but "very weak, and statistics was 1 in 7." DNA from at least three people was present on the knife blade, but Giles's DNA was not.

(x) *Sightings of Villalobos's Mustang near Giles's home*

Villalobos owned a gray Ford Mustang GT with a "scooped" hood. The vehicle had a "throaty" or "high performance exhaust" that made a loud noise.

---

[3]    Of Giles's 32 wounds, 13 were selected for analysis. Kowal concluded nine of the wounds fit the dimensions of Villalobos's knives. Four of the wounds selected for analysis had variations that could have been due to factors such as skin elasticity, movement of the victim during the attack, or positioning of the body during the autopsy, or might have indicated use of a second knife. According to the autopsy report, two of the four wounds were made by an instrument with two sharp sides, whereas Villalobos's knives had a blunt edge and a sharp edge.

Giles's neighbor Sheri Saurer, an experienced automobile mechanic, heard a car in the neighborhood with a loud exhaust four or five times during the two to three weeks prior to the murder. She looked out her window approximately three times to see the car making the noise, and observed a silver or gray Mustang "almost exactly" like Villalobos's. She saw the car parked on Joaquin Drive once and observed it driving from Brace Canyon onto Joaquin several times. Giles's neighbor Lisa Spellman saw Villalobos's Mustang parked on Joaquin Drive on February 15, 2008. When she drove by later, a man exited the car and walked towards Giles's house. She could not identify the man.

(xi) *Villalobos's work schedule*

Villalobos worked at Brinks Incorporated, located at 12730 Raymer Street in North Hollywood. Villalobos worked on February 25, 2008, from 9:35 a.m. until 9:41 p.m. He had the day off on February 26, 2008 and was not scheduled for training that morning.

(xii) *Police interviews of Ingram*

Police officers interviewed or interrogated Ingram multiple times over the course of several days. She initially did not disclose that she was or had been in a relationship with Villalobos, but provided that information only after police discovered her text messages to him. During subsequent interviews, certain officers called her a liar, accused her of being an accessory to the murder, told her her life was over, refused to believe her statements, and implied she should say what they wanted to hear. They called her a "fucking bitch" and threatened to shove her head against the table and make it look like an accident. Officers informed her that blood had been found in the Mustang. Because she was frightened and exhausted, Ingram lied to the officers. Among other things, she falsely stated that she used Giles to make Villalobos jealous, left Giles's address out for Villalobos to find, and observed Villalobos's Mustang at Giles's residence when she and Giles were in a hot tub together. She also falsely stated that Villalobos was extremely violent and had stated he was going to go take care of Giles.

11

2. *Defense evidence*

As relevant here, the defense presented the following evidence. Villalobos's sister-in-law, Lideth, saw Villalobos at his San Gabriel home at approximately 7:20 a.m. on the morning of February 26, 2008.

Dr. David Posey, a forensic pathologist retained by the defense, opined that Giles died between 6:00 a.m. and 8:00 a.m. on the morning of February 26. It was highly improbable Giles died between 10:30 p.m. on February 25 and 2:30 a.m. on February 26. His opinion was based on Giles's ambient body temperature, the degree of rigor mortis, the fact the blood at the crime scene was still wet, and the contents of Giles's stomach.

As discussed more fully *post,* Villalobos's mother testified that he arrived home on the night of February 25 at approximately 11:30 p.m.

3. *Rebuttal evidence*

Detective Henry Garay listened to a telephone conversation between Villalobos and his mother recorded while Villalobos was in jail on February 27, 2008. She stated she was awake at 11:00 p.m. and Villalobos was not yet home.

As discussed more fully *post,* Officer Zepeda testified regarding Villalobos's mother's statements.

4. *Procedure*

Trial was by jury. Villalobos was convicted of first degree murder. (Pen. Code, § 187, subd. (a).)[4] The jury found he committed the crime "willfully, unlawfully, deliberately and with malice aforethought." It further found he personally used a deadly and dangerous weapon, a knife, in commission of the crime. (§ 12022, subd. (b)(1).) The trial court sentenced Villalobos to 26 years to life in prison. It ordered him to pay direct victim restitution of $8,000 and imposed a restitution fine, a suspended parole restitution fine, a court security assessment, and a criminal conviction assessment. Villalobos appeals.

---

[4] All further undesignated statutory references are to the Penal Code.

DISCUSSION

1. *Sufficiency of the evidence*

Villalobos contends the evidence was insufficient to establish he was the murderer, and therefore his conviction must be reversed. We disagree.

When determining whether the evidence was sufficient to sustain a criminal conviction, " ' "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]' " (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1104; *People v. Johnson* (2015) 60 Cal.4th 966, 988.) We presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. (*People v. Medina* (2009) 46 Cal.4th 913, 919.) Reversal is not warranted unless it appears " 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331; *People v. Zamudio* (2008) 43 Cal.4th 327, 357.) The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence. (*People v. Brown* (2014) 59 Cal.4th 86, 106.) We must accept logical inferences the jury might have drawn from the evidence even if we would have concluded otherwise. (*People v. Solomon* (2010) 49 Cal.4th 792, 811-812.)

There was ample evidence to establish Villalobos was the murderer. Giles had recently begun dating Ingram, who – unbeknownst to Giles – was Villalobos's girlfriend or ex-girlfriend. Villalobos refused to acquiesce in Ingram's wish to end their relationship and became angry when Ingram attempted to break up. He stated that he "didn't want to be made a fool of and no one is going to mess with him" and he would " 'fuck up any motherfucker that plays with me.' " Villalobos knew who Giles was: he had seen him at the Elks Lodge and at the Robin Hood restaurant. He had Giles's number and repeatedly phoned him, using a blocking feature. Neighbors saw and heard his distinctive Mustang on or near Joaquin Drive. Cell phone records showed Villalobos was near Giles's home at approximately 10:30 p.m. on the night of or preceding the

13

murder. Villalobos worked in North Hollywood and lived in San Gabriel, and there was no explanation for his presence near Giles's home in Burbank at that time. Giles's phone was stolen during the attack, and was found moving southwest at 12:45 a.m. This fact, coupled with the deputy medical examiner's estimate of the time of death, suggested the murder was completed by that time. Villalobos owned a used Ka-Bar fighting knife that was specially designed for combat and provided protective features so that the user's hand would not be injured. The knife had damage apparently resulting from contact with a hard surface like concrete. There was a gouge on the concrete floor in Giles's bedroom. Comparison of Giles's wounds with the characteristics of the knife indicated it could have been the murder weapon. Giles bled profusely, and the knife had blood grooves to facilitate bleeding. Giles could not be excluded as a donor of DNA on the knife sheath, though the evidence he was a contributor was weak. The bloody sock prints matched Villalobos's footprints, and only a very small number of other persons could have made the same print. A bloodhound tracked scent taken from the bloody handprint to Villalobos's front door. The crime appeared inconsistent with a robbery: Giles's wallet on the dresser was undisturbed and the house was not ransacked. And most tellingly, the victim's DNA was found in bloodstains in Villalobos's Mustang.

Villalobos contends that the foregoing evidence was legally insufficient.[5] He argues that Ingram was an admitted liar whose testimony was unbelievable. The bloody money dropped on the hillside suggested the motive for the murder was robbery. No eyewitness observed the murder, and no one saw Villalobos enter or leave Giles's house on the night of the murder. No witness identified Villalobos as the driver of the Mustang seen or heard near Giles's home. The cell phone records showed, at most, that Villalobos was attempting to determine whether Ingram was seeing Giles, not that he intended to murder Giles. Villalobos could not have determined, by calling Giles's cell phone at

---

[5]    Villalobos appropriately does not challenge the sufficiency of the evidence to prove premeditation and deliberation. As our recitation of the facts makes clear, there was ample evidence of motive, manner of killing, and planning, three of the factors commonly used to establish premeditation.

approximately 10:30 p.m. on the night of February 25, whether Giles was home because Giles's phone was a mobile device. The phone records indicating Giles's phone was moving at 12:45 a.m. did not necessarily show the murder had already transpired; it was possible Giles was alive and driving home at that time. The time of death could not be reliably ascertained by reference to Giles stomach contents, because he might have stopped for a drink with friends after leaving the Elks Lodge. The defense expert testified that time of death was the following morning, when Villalobos's witnesses testified he was home in San Gabriel. Deputy Medical Examiner Wang's contrary opinion was "discredited" because he failed to consider a variety of factors that the defense expert found important. None of the knives found in Villalobos's closet were definitively identified as the murder weapon, and there were inconsistencies between the measurements of the used Ka-Bar knife and some of Giles's wounds. The dog scent evidence was unreliable for a variety of reasons. Villalobos's fingerprints and DNA were not found at the crime scene, and the bloody sock prints were not definitively identified as his. The fact Giles's blood was found in Villalobos's Mustang was not compelling evidence of guilt because "there is a strong probability Giles'[s] blood was planted in . . . Villalobos'[s] car by the police," demonstrated by the fact that officers told Ingram Giles's blood had been found in the Mustang before the criminalist discovered it there.

None of these arguments demonstrate the challenged evidence was physically impossible or inherently improbable. Villalobos's arguments amount to a request that this court reweigh the evidence and substitute our judgment for the jury's. This we cannot do. The fact the evidence might have been reconciled with a contrary finding does not warrant a reversal. (See, e.g., *People v. Harris* (2013) 57 Cal.4th 804, 849-850; *People v. Livingston* (2012) 53 Cal.4th 1145, 1170.) We resolve neither credibility issues nor evidentiary conflicts. (*People v. Friend* (2009) 47 Cal.4th 1, 41; *People v. Tripp* (2007) 151 Cal.App.4th 951, 955; *People v. Cortes* (1999) 71 Cal.App.4th 62, 81 [where an appellant "merely reargues the evidence in a way more appropriate for trial than for appeal," we are bound by the trier of fact's determination].) Although it is the jury's duty to acquit if it finds that circumstantial evidence is susceptible of two interpretations, one

15

of which suggests guilt and the other innocence, it is the jury, not the appellate court, which must be convinced of the defendant's guilt beyond a reasonable doubt.  (*People v. Harris*, at pp. 849-850; *People v. Iboa* (2012) 207 Cal.App.4th 111, 117.)  As we have discussed, the evidence supported the jury's verdict, and there was no evidentiary deficit.

2.  *Purported evidentiary errors*

Villalobos contends the trial court erred by admitting evidence about his mother's statements, vandalism to Ingram's car, and the knives found in his bedroom closet.

a.  *Applicable legal principles and standard of review*

"Except as otherwise provided by statute, all relevant evidence is admissible." (Evid. Code, § 351.)  Evidence is relevant if it has any tendency in reason to prove any disputed fact that is of consequence to the determination of the action.  (Evid. Code, § 210; *People v. Williams* (2008) 43 Cal.4th 584, 633-634; *People v. Wilson* (2006) 38 Cal.4th 1237, 1245.)  Under Evidence Code section 352, a court has discretion to exclude evidence if its probative value is substantially outweighed by the probability its admission will create a substantial danger of undue prejudice.  (*People v. Williams* (2013) 58 Cal.4th 197, 270-271.)  We review a trial court's rulings on the admissibility of evidence and application of Evidence Code section 352 for abuse of discretion. (*People v. Leon* (2015) 61 Cal.4th 569, 597, 599; *People v. Masters* (2016) 62 Cal.4th 1019, 1056.)

The erroneous admission of evidence "does not require reversal except where the error or errors caused a miscarriage of justice."  (*People v. Richardson* (2008) 43 Cal.4th 959, 1001; Evid. Code, §§ 353, subd. (b), 354.)  " '[A] "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' "  (*People v. Richardson, supra,* at p. 1001; *People v. Watson* (1956) 46 Cal.2d 818, 836.)  The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair.  (*People v. Hamilton* (2009) 45 Cal.4th 863, 930; *People v. Partida* (2005) 37 Cal.4th 428, 439.)

16

b. *Evidence regarding vandalism to Ingram's car*

(i) *Additional facts*

Prior to trial the People moved to admit, pursuant to Evidence Code sections 1101, subdivision (b) and 1109, evidence that Ingram had wished to end her relationship with Villalobos but was afraid he would retaliate if she did so. According to the People's motion, Villalobos followed Ingram to her workplace and other locations and incessantly telephoned her. Ingram believed Villalobos was responsible for two or three instances of vandalism to her car in February 2008. The vandalism included smashing her windshield, letting the air out of one of her tires, and scratching her car. The People also sought to admit evidence that Villalobos had beaten and sexually assaulted a former girlfriend and vandalized her car, and acted in a "possessive" manner towards a woman who worked for him in 2000. The People argued that this evidence was relevant to prove motive, intent, identity, and common plan.

The trial court initially denied the People's motion without prejudice. As pertinent here, it excluded the evidence of vandalism to Ingram's car because Villalobos was not charged with domestic violence and his conduct toward Ingram was not probative in regard to his alleged murder of Giles.[6]

During redirect examination of James Ewart, the Elks Lodge chef and a friend of both Ingram and Giles, the prosecutor elicited that Ingram had been uncomfortable with her relationship with Villalobos during the six months preceding Giles's murder. The prosecutor asked for the "circumstances" upon which Ewart's impression was based. Ewart answered: "At the lodge. And there had been vandalism to her car---" Defense counsel's hearsay objection was sustained and the answer stricken. The prosecutor then asked whether Ewart had observed that Ingram's car had been vandalized. In a sidebar conference, the trial court asked whether there was evidence Villalobos was responsible for the vandalism. The prosecutor stated there was evidence Ingram *believed* Villalobos

---

[6] The trial court excluded evidence of Villalobos's alleged conduct towards the other women. That ruling is not at issue here.

17

was responsible.  The trial court allowed the prosecutor to ask whether Ewart had observed vandalism to the car, but nothing else.  Ewart then recounted that approximately two weeks before the murder, he observed that a window on Ingram's car had been smashed while the car was parked at the Elks Lodge.  A day or two before the murder, he observed that the valve stem on one of Ingram's tires had been removed and the tire partially flattened.

At the conclusion of the day's proceedings, the trial court expressed concern that the prosecutor had violated its order excluding evidence of the vandalism.  When proceedings resumed, the trial court clarified that the prosecutor had not committed misconduct.  However, Ewart's testimony about the vandalism should have been excluded as irrelevant hearsay.  Ingram's state of mind was not at issue.  Absent evidence Villalobos was the person who vandalized the car, the evidence was irrelevant.  However, the court opined that the erroneous admission of the evidence was harmless.  It granted defense counsel's request that the testimony be stricken.  Subsequently, the court orally informed the jury that Ewart's testimony about the vandalism was not to be considered.[7] The court's final instructions to the jury included the admonition that it could not consider any evidence that was stricken from the record.[8]  (CALCRIM No. 222.)

(ii) *Discussion*

Villalobos argues the evidence was irrelevant and was inadmissible propensity evidence that should have been excluded under Evidence Code section 1101, subdivision (a).  He urges the "introduction" of evidence he may have vandalized Ingram's car deprived him of due process and a fair trial in violation of his federal constitutional rights.

---

[7]    The court stated:  "Ladies and gentlemen, before the People call their next witness, on Friday, you'll remember Jim Ewart testified in court.  His testimony as to any vandalism to Christina Ingram's car is stricken and not to be considered."

[8]    The court's instruction, in pertinent part, stated:  "If I ordered testimony stricken from the record you must disregard it and must not consider that testimony for any purpose."

18

The flaw in Villalobos's argument is that the evidence *was* excluded; the trial court ordered it stricken. Any potential harm was remedied when the trial court instructed the jury not to consider it. We presume the jury followed the trial court's instructions, and nothing in the record here suggests otherwise. (*People v. Homick* (2012) 55 Cal.4th 816, 866-867; *People v. Smith* (2007) 40 Cal.4th 483, 517-518 [" 'The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions.' "].) Contrary to Villalobos's argument, we do not agree that the court's instruction merely "emphasized" the evidence. Nor was the evidence so inherently prejudicial that the jury would have been unable to disregard it. "Whether it would be impossible for a jury to follow limiting instructions is determined by the circumstances of each case, primarily in the trial court's discretion under Evidence Code section 352." (*Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 599.) Here, the trial court concluded the error was harmless. The challenged testimony was limited and non-inflammatory. It comprised an exceedingly brief portion of the six-week trial. Villalobos has failed to establish any violation of his rights to due process and a fair trial.

c. *Villalobos's mother's statements*

(i) *Additional facts*

The prosecution called Villalobos's mother, Guadalupe Villalobos, as a witness in its case-in-chief.[9] She testified that she was home on the evening of February 25, 2008, and retired to her bedroom to watch the news, which was on between 11:00 p.m. and midnight. Villalobos was at work and arrived home at approximately 11:30 p.m., while she was watching the news.

Officer Zepeda testified that he spoke to Guadalupe during the search of the Villalobos house on February 27, 2008. She told him she recalled Villalobos coming home on February 25, but was unsure of the time; she was also unsure whether he left

---

**9** For ease of reference, and with no disrespect, we hereinafter refer to Villalobos's mother by her first name, Guadalupe.

after he arrived home. The trial court denied the prosecutor's sidebar request to ask Zepeda whether Guadalupe made statements about Villalobos's temperament.

Guadalupe was later called as a witness for the defense. She testified that the search of her home was very difficult because seven or eight officers arrived very early in the morning and left Villalobos's room in great disarray. The officers asked her many questions about Villalobos and Ingram, and told her Villalobos "was in a very big problem." During cross-examination, the prosecutor asked whether she told Zepeda that of her three sons, Villalobos had the worst temper. Without objection, Guadalupe denied making the statement but admitted stating that her three children had different personalities.

The People recalled Officer Zepeda. He testified that he asked Guadalupe whether Villalobos "got mad easily." She replied that, of all her sons, Villalobos had the worst temper. She asked "what had happened in Burbank." Zepeda told her a serious crime had occurred. Guadalupe began to cry and asked if Ingram had been murdered. Zepeda had not told her Villalobos had been arrested for murder. Defense counsel did not object to this testimony.

During argument, the prosecutor argued "it was very telling that [Guadalupe] readily accepted that the trouble in Burbank was that the defendant must have killed" and "basically confirmed that the investigation was where it should have been with the son with the temper, the defendant." The prosecutor further argued: "when a mother says in response to there is a crime in Burbank or anything of that nature, is my son's girlfriend dead? That speaks volumes, ladies and gentlemen. That tells you a story all by itself. That tells you what this defendant is capable of."

(ii) *Discussion*

Villalobos argues introduction of his mother's statements about his temper and the possibility Ingram had been murdered deprived him of due process and a fair trial. He urges that "[w]hether this was a case of prosecutorial misconduct" or whether Zepeda volunteered the information, reversal is required. The People respond that Guadalupe's statements were properly admitted because they fell within the spontaneous statement

20

exception to the hearsay rule, and in any event no prejudice is apparent because the evidence of guilt was overwhelming.

Villalobos's contention has been forfeited because he failed to object to the evidence or to the prosecutor's argument. (See *People v. Linton* (2013) 56 Cal.4th 1146, 1205 [to preserve a claim of prosecutorial misconduct, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument]; Evid. Code, § 353, subd. (a); *People v. Cage* (2015) 62 Cal.4th 256, 282 [failure to object to evidence forfeits the contention on appeal]; *People v. Lindberg* (2008) 45 Cal.4th 1, 48.) Villalobos argues he had no opportunity to object. He contends that the trial court denied the People's pretrial motion to introduce evidence of his uncharged crimes against other women and had prohibited questions to Zepeda, during his earlier testimony, regarding Guadalupe's statements. Therefore, Villalobos argues, defense counsel could not have anticipated that the prosecutor would introduce the evidence. Any objection would simply have highlighted the evidence before the jury.

We disagree. Defense counsel had ample opportunity to object and could have expected a favorable ruling given the trial court's earlier exclusion of Zepeda's testimony. Guadalupe's statements did not pertain to the uncharged misconduct at issue in the pretrial motion, and the trial court's rulings on that subject were irrelevant to defense counsel's failure to object. However, because Villalobos avers defense counsel provided ineffective assistance, we address the merits of that claim.[10]

Evidence Code section 1101, subdivision (a) provides that subject to exceptions not pertinent here, "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct

---

[10] The People's argument that Guadalupe's statements were admissible under the spontaneous statement exception to the hearsay rule (Evid. Code, § 1240) is unhelpful. Villalobos does not contend the evidence was objectionable because it constituted hearsay; he argues it was improper propensity evidence and should have been excluded under Evidence Code section 352.

21

on a specified occasion." Accordingly, "[c]haracter evidence, sometimes described as evidence of a propensity or disposition to engage in a type of conduct, is generally inadmissible to prove a person's conduct on a specified occasion." (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1159; *People v. Carter* (2005) 36 Cal.4th 1114, 1147.)

To the extent Villalobos argues Guadalupe's statements disclosed his prior violent acts or uncharged offenses, he is incorrect. Her statement about his temper and her concern that Ingram might have been murdered did not disclose that Villalobos had committed any prior violent conduct or an uncharged crime. However, Guadalupe's statement that Villalobos had a bad temper amounted to improper character evidence, and the People offer no argument demonstrating a legitimate basis for its admission. The People also relied on Guadalupe's query about Ingram to show Villalobos's violent character, assuming the comment implied Villalobos's own mother believed he was capable of murder. This was also improper character evidence.

However, Villalobos has failed to establish his counsel provided ineffective assistance by failing to object. To establish ineffective assistance of counsel, a defendant must show counsel's representation fell below an objective standard of reasonableness and there is a reasonable probability that, but for counsel's errors, a more favorable determination would have resulted. If the defendant makes an insufficient showing on either component, the claim fails. (*People v. Johnson* (2016) 62 Cal.4th 600, 653; *People v. Homick, supra,* 55 Cal.4th at p. 893, fn. 44.) Counsel has wide discretion in choosing the means by which to provide constitutionally adequate representation. (*People v. Johnson, supra,* at p. 653.) If the record on appeal fails to show why counsel acted or failed to act, " ' "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal. [Citation.]" ' " (*Ibid.*)

The record here does not demonstrate there could be no satisfactory explanation for counsel's failure to object. One theme of the defense case was that the investigation and the People's case were filled with contradictions and much of the evidence was unbelievable. Conceivably, counsel might have made a deliberate tactical choice not to

22

object to the evidence or argument on the theory the evidence was unbelievable, and could be used to the defense's advantage. (See *People v. Johnson, supra,* 62 Cal.4th at p. 654 [counsel might have made a deliberate tactical choice not to object to the prosecutor's argument so counsel could use it to his advantage during argument].) Here, defense counsel argued in closing that it was unbelievable Villalobos's mother would tell a police officer Villalobos had a bad temper or imply he might have killed Ingram at the same time her home was being searched. Moreover, the challenged testimony and argument was but a brief portion of the trial. In light of the evidence discussed *ante,* Villalobos has failed to show there is a reasonable probability that a more favorable determination would have resulted had the evidence been excluded.

  d. *The knives found in Villalobos's bedroom closet*

  Villalobos moved prior to trial to exclude evidence of the knives found in his bedroom closet as well as Kowal's and Emerson's expert testimony. The prosecution sought a contrary ruling that the evidence was admissible. After extensive consideration of the issue, the trial court ruled the evidence was admissible because none of the knives could be excluded as the murder weapon, and the evidence was more probative than prejudicial under Evidence Code section 352.

  Villalobos contends the trial court's ruling was an abuse of discretion that deprived him of due process and a fundamentally fair trial. He cites, inter alia, *People v. Henderson* (1976) 58 Cal.App.3d 349, 360 and *People v. Archer* (2000) 82 Cal.App.4th 1380, 1392-1393, for the principle that evidence a defendant possessed weapons not used in the charged crime is irrelevant and amounts to inadmissible propensity evidence. Villalobos contends, in essence, that because the knives were not definitively identified as the murder weapon they should have been excluded. He points out that the knives were not unique and were readily available; there were some inconsistencies between some of the wounds and the knives' characteristics; Giles's DNA was not found on the blade; and the probability Giles's DNA was on the knife sheath was weak.

  We discern no error. "When the prosecution relies on evidence regarding a specific type of weapon, it is error to admit evidence that other weapons were found in

23

the defendant's possession, for such evidence tends to show not that he committed the crime, but only that he is the sort of person who carries deadly weapons." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1056; *People v. Cox* (2003) 30 Cal.4th 916, 956, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Riser* (1956) 47 Cal.2d 566, 577, disapproved on other grounds in *People v. Chapman* (1959) 52 Cal.2d 95, 98 and *People v. Morse* (1964) 60 Cal.2d 631, 637, fn. 2, 648.)[11] However, it has long been held that "[w]hen the specific type of weapon used to commit a homicide is not known, it may be permissible to admit into evidence weapons found in the defendant's possession some time after the crime that could have been the weapons employed. There need be no conclusive demonstration that the weapon in defendant's possession was the murder weapon." (*People v. Riser, supra,* at p. 577; *People v. Cox, supra,* at p. 956.)[12] For example, *People v. Carpenter* (1999) 21 Cal.4th 1016 held testimony the defendant stated he kept a gun in his van was properly admitted. "Although the witnesses did not establish the gun necessarily was the murder weapon, it might have been. . . . [T]his evidence did not merely show that defendant was a person who possesses guns, but showed he possessed a gun that might have been the murder weapon after the first and before the last of the killings. The evidence was thus relevant and admissible as circumstantial evidence that he committed the charged offenses." (*Id.* at p. 1052.)

    *People v. Mills* (2010) 48 Cal.4th 158, compels rejection of Villalobos's argument. In *Mills,* the victim's throat and breast had been cut. The trial court admitted evidence that two box cutters, a small knife, and a larger knife were found in the defendant's

---

**11**     As noted *ante,* the evidence showed that several guns were also found in Villalobos's closet. Defense counsel expressly stated that, as a strategic decision, the defense did not object to admission of this evidence.

**12**     When a weapon is otherwise relevant to the crime's commission, but is not the actual murder weapon, it may also be admissible. (*People v. Cox, supra,* 30 Cal.4th at pp. 956-957.) Here, the People did not contend the knives were admissible for such purposes.

bedroom and car.  (*Id.* at p. 196.)  An expert testified that many types of knives could have caused the fatal neck wound, which was not unique or distinctive, and any of the four cutting devices could have been the murder weapon.  The defendant subsequently admitted he killed the victim with a Swiss Army knife.  (*Id.* at p. 197.)  As here, the defendant argued that because none of the other four cutting devices could definitively be identified as the murder weapon, the evidence was irrelevant and prejudicial under Evidence Code section 352, and its admission violated his rights to due process and a fundamentally fair trial.  (*People v. Mills, supra,* at p. 196.)  Our Supreme Court disagreed, explaining:  "Because defendant was accused of killing the victim by cutting her throat and shortly after the crime was found in possession of several cutting devices, any one of which could have been the murder weapon, the trial court acted within its discretion in finding the evidence to be relevant.  [Citation.]  Moreover, as it was made clear to the jury that a forensic analysis could not definitively identify any of the four devices as the murder weapon, the court did not abuse its discretion in finding the evidence to be more probative than prejudicial.  [Citation.]"  (*Id.* at p. 197.)

The same is true here.  The evidence showed any one of the three knives could have been the murder weapon.  Admissibility did not hinge on conclusive proof the weapons were actually used to commit the murder.  (*People v. Riser, supra,* 47 Cal.2d at p. 577.)  Evidence Villalobos possessed knives that might have been the murder weapon was relevant and admissible circumstantial evidence that he committed the crime.  The People did not offer the knives to show Villalobos was the sort of person who collected deadly weapons and therefore had a propensity to commit the crime.  Admission of the evidence the knives were found in his closet, and Kowal's testimony that Giles's wounds could have been made by the knives, was therefore proper.  (See also, e.g., *People v. Homick*, *supra*, 55 Cal.4th at pp. 876-877; *People v. Cox, supra,* 30 Cal.4th at p. 956; *People v. De La Plane* (1979) 88 Cal.App.3d 223, 239.)[13]

---

[13]     The federal authorities cited by Villalobos are distinguishable.  In *McKinney v. Rees* (9th Cir. 1993) 993 F.2d 1378, the trial court admitted evidence the defendant had sometimes worn a knife on his clothing before the murder, and had once owned a knife

Villalobos further argues that even if the knife evidence was admissible, it should have been excluded under Evidence Code section 352 as more prejudicial than probative. He complains that the knife itself, in addition to photographs, was shown to the jury; Emerson demonstrated how the knife "could be efficiently used to kill the victim," a highly inflammatory display; and during closing argument the prosecutor referred to the knife as a "killing knife," although the trial court had ordered her not to describe the knife this way when examining Emerson. None of these arguments establish prejudice within the meaning of Evidence Code section 352. That Villalobos was in possession of fighting knives that might have been the murder weapon soon after the killing was highly probative evidence. We fail to see how the display of the knife itself, as opposed to a photograph, was inflammatory or prejudicial. Emerson did not demonstrate how the knife could be used to kill another person, as Villalobos suggests. Emerson did briefly demonstrate the "hammer grip" to illustrate that the knife's design concentrated force to the point. He also briefly demonstrated the direction and motion necessary to have caused the slight damage to the used knife. But Emerson never purported to demonstrate the knife's' killing capabilities. Even assuming arguendo that the prosecutor erred by referring to the knife as a "killing knife" during argument, we discern no possible prejudice. The People's theory was that the used Ka-Bar knife was, in fact, used to kill the victim, and the evidence showed the knife was used by the military in combat situations. While the evidence was no doubt unfavorable for the defense, " ' "[p]rejudice" in the context of Evidence Code section 352 is not synonymous with "damaging": it refers to evidence that poses an intolerable risk to the fairness of the

___

that was indisputably no longer in his possession at the time of the murder. The Ninth Circuit concluded this evidence was irrelevant and impermissible character evidence. (*Id.* at pp. 1382-1384.) In *Alcala v. Woodford* (9th Cir. 2003) 334 F.3d 862, the court held it was error to admit evidence the defendant's mother owned two unused sets of cutlery, which were not found in the defendant's direct possession, were not purchased by the defendant, and differed in many material respects from the knife found at the murder scene. (*Id.* at p. 887.) Here, in contrast to these cases, Villalobos was found in possession of three knives shortly after the murder, any of which could have been the murder weapon.

proceedings or reliability of the outcome." ' " (*People v. Duff* (2014) 58 Cal.4th 527, 564; *People v. Scott* (2011) 52 Cal.4th 452, 491.)[14]

   3. *Cumulative error*

Villalobos contends that the cumulative effect of the purported errors deprived him of due process and a fair trial. As we have " 'either rejected on the merits defendant's claims of error or have found any assumed errors to be nonprejudicial,' " we reach the same conclusion with respect to the cumulative effect of any purported errors. (*People v. Cole* (2004) 33 Cal.4th 1158, 1235-1236; *People v. Butler* (2009) 46 Cal.4th 847, 885.)

---

[14]    In light of our conclusion that the trial court did not err, we need not reach the parties' arguments regarding whether admission of the knife evidence was prejudicial.

DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ALDRICH, Acting P. J.

We concur:

LAVIN, J.

HOGUE, J.*

---

*        Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.